**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY REDLEY,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| v. | : | |
| **WHOLE FOODS MARKET** | : | |
| **GROUP, INC.** *et al.*, | : | **No. 19-2908** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                           FEBRUARY 24, 2021

### BACKGROUND

Plaintiff Anthony Redley has worked at Whole Foods for approximately 20 years but was never promoted to "Store Team Leader." He argues during this time, that less qualified white employees were promoted ahead of him due to a policy called the "tap." This unwritten policy allegedly required that an Assistant Store Team Leader receive the permission of his or her supervisor to apply for Store Team Leader position. Mr. Redley argues that this policy gave Store Team Leaders "license to allow their conscious and subconscious biases to dictate the process."

Whole Foods has moved for summary judgment on all of Mr. Redley's claims. For the reasons that follow, the Court will grant the motion in part.

### I.    Whole Foods's Organizational Structure

Whole Foods is a nationwide chain of grocery stores. *See McFadden v. Whole Foods Mkt. Grp., Inc. et al.*, Case No. 19-1103, Doc. No. 35-19 ¶ 1.[1] Like many companies, Whole Foods has a hierarchical structure and is divided into many different geographical regions. Mr. Redley has only worked at stores within the Mid-Atlantic Region ("MA Region"). Regional leadership is

---

[1]    Hereafter, citations to entries on the docket for *McFadden v. Whole Foods*, 19-1103 will be preceded by "*McFadden*,".

divided into three levels of hierarchy: the Regional President, Regional Vice-President, and Executive Leaders of Operations. *Id.* ¶¶ 5-6. Scott Allshouse is currently the Regional President of the MA Region. *Id.* ¶ 5. David Pinkney was an Executive Leader of Operations in the MA Region during most of the events at issue in this case. *Id.* ¶ 6-7. Travis Phaup became an Executive Leader in September 2017. *See id.* ¶ 6.b. Regional leadership oversees the stores within their region.

While the number of stores has changed over time, there were 54 stores in the MA Region in January 2020. *Id.* ¶ 90. Within each store, there are no fewer than five levels of hierarchy. At the top of the pyramid is the Store Team Leader ("STL"), who manages that store and reports to regional leadership. *See id.* ¶¶ 3-4. The second level of store hierarchy is the Assistant Store Team Leaders ("ASTLs") who report to the STL. *See id.* at ¶¶ 3-4. While there is only one STL, there is usually two or three ASTLs who, according to corporate-speak, assisted the STL and helped run the store. *Id.* ¶ 4. The third and fourth level of hierarchy are Team Leaders ("TLs") and Assistant Team Leaders ("ATLs"), respectively. *Id.* ¶ 3. The remaining store employees are known simply as Team Members ("TMs"). *Id.* Everyone thus has a title.

## II.     Mr. Redley's Career at Whole Foods

Mr. Redley began his career at Whole Foods in 2000[2] as a dishwasher Team Member. (Doc. No. 26 ¶ 16.) He left after a short time because he thought his supervisor was disrespectful. He quickly returned because he "missed the company," and he became a Seafood TM. *Id.* ¶ 17. Mr. Redley was only 20 years old when he began working at Whole Foods, and testified that Whole Foods "brought me up from a boy to a man." *Id.* ¶ 111. Plaintiff noted that at first he did

---

[2]     Defendants argue—and Mr. Redley does not contest—that the statute of limitations bars claims for conduct before July 3, 2015. The Court includes facts from before this time period for background purposes.

not know "how to conduct myself in a business setting." *Id.* ¶¶ 19-20.  For example, Plaintiff stated that he sometimes had difficulty interacting with elderly customers from the nursing home across the street and dealing with demanding customers. *Id.* ¶¶ 20-21.  Nevertheless, Mr. Redley quickly felt that he quickly mastered his job, and stated in a 2003 "Job Dialogue": "[s]ometimes I feel as if I'm the Einstein of seafood with my great decision making skills." *Id.* ¶ 21.

Mr. Redley began seeking  promotions.  After being at the store for four years, Mr. Redley saw an opening for an ATL position at the Wynnewood store. *Id.* ¶¶ 23-24.  After speaking to his STL about the position, he applied and was hired. *See id.* ¶ 25.  As ATL, he reported to TL Jaleel McFadden, a plaintiff in parallel litigation against Whole Foods. *Id.* ¶ 26.

Mr. Redley continued to achieve promotions.  After working as an ATL in Wynnnewood for about 18 months, Mr. Redley became a TL at the Whole Foods in Devon in 2007. *Id.* ¶ 29.  In 2011, his supervisor Joe Greenlee made him an acting ASTL for six months. *Id.* ¶ 44.  After that time, Mr. Greenlee told Mr. Redley about a training program for ASTLs. *Id.* ¶ 44.  Mr. Redley applied, was interviewed by a panel, and was admitted to the program. *Id.*  After graduating, he was made an ASTL at Wynnewood without applying for the position. *Id.* ¶ 47.

While still in the ASTL program, Mr. Redley stated in a Job Dialogue that he felt "strongly I should be a STL over the next year."  This did not happen, but Mr. Redley nonetheless continued to obtain promotions.  After working as an ASTL at Wynnewood for three months, Mr. Pinkney told Mr. Redley that because he was so proud of his work as a TL and ASTL, Mr. Redley should help open the new Glenn Mills store. *Id.* ¶ 48.  Mr. Redley applied and secured the Glenn Mills ASTL position, where he worked from 2012 to 2014. *Id.*  At Glenn Mills, he worked under STL John Frei who he described during his deposition as "a really good leader for me to be under. Wonderful guy." *Id.* ¶ 49.

Mr. Redley testified that he wanted to apply for an STL position right away. Mr. Pinkney responded that he "didn't want to put [Mr. Redley] in a position to fail," and instead counseled him to apply for the position of ASTL at Plymouth Meeting to receive more experience. *Id.* ¶ 53. Mr. Redley described Plymouth Meeting as a "pressure cooker store" because it was a flagship store, and Whole Foods management frequently visited that store which would give Mr. Redley "more exposure with them." *Id.* ¶¶ 53-54. At Plymouth Meeting, Mr. Redley reported to STL Dale Stirzel. *Id.* ¶ 55. Mr. Redley visited Mr. Stirzel at his house two or three times for store-related events. *Id.* ¶¶ 57-58. Mr. Redley brought his wife and four children to these events. *Id.* ¶ 59. He also went to Mr. Stirzel's house a "couple of times" to watch football games. *Id.* ¶ 57. Mr. Stirzel once invited Mr. Redley on a "food tour." (Doc. No. 28-5 ¶ 62.) Both Mr. Stirzel and Mr. Redley were "spiritual," and Mr. Redley invited Mr. Stirzel to a performance at Mr. Redley's church. *Id.* ¶¶ 62-63.

After working with Mr. Stirzel for two and a half years, Mr. Redley expressed interest in applying for the STL position at the North Wales store.[3] (Doc. No. 39-32 ¶ 61.) Mr. Stirzel and Mr. Pinkney, who were both executive coordinators at that time, declined to support him. *Id.* ¶¶ 63-64. Mr. Pinkney told him he needed more ASTL experience. *Id.* Mr. Pinkney told him that the best thing to make his resume more "well-rounded" was to work at another store. (Doc. No. 28-5 ¶ 67.) Therefore, Mr. Redley submitted a written application for a position as ASTL at Wynnewood, was interviewed by a panel, and secured the position. *Id.* ¶ 68. Mr. Redley first worked under STL Alison Marcantuno, and later Carter Quigg in 2017. *Id.* ¶¶ 68-69.

In 2017, Mr. Redley once again expressed interest in an STL position. His complaint states that he expressed interest in numerous positions in February and March 2017, but when asked

---

[3]     Although outside of the limitations period, earlier events may still be considered as evidence.

about it during his deposition, he could only recall expressing interest in the Vienna, Virginia opening. (Doc. No. 25-2 at 18.) His supervisor at this time, Alison Marcantuno, told Mr. Redley that she was "okay" with him applying and that he should talk to Mr. Pinkney. *Id.* ¶ 152. Mr. Pinkney told him that nothing "would hold [Mr. Redley] back from applying for the job" and that Mr. Redley should talk to Nicole Wescoe, the Regional Vice President in the MA Region. *Id.* ¶ 154. Ms. Wescoe directed him back to Mr. Pinkney. *Id.* ¶ 156. At this juncture, Mr. Pinkney said that he "wouldn't be able to support" Mr. Redley because Omar Tejada, Plaintiff's co-ASTL, was also applying for the position and Mr. Pinkney did not want to lose both of them at the same time. *Id.* ¶¶ 156-57. In the end, Mr. Tejada did not secure the position. *Id.* ¶ 160. Mr. Redley did not know who was ultimately selected for this position, and neither party supplied this information in their briefs to the Court. *See id.* ¶¶ 18, 159.

Mr. Redley also expressed interest in a 2017 opening at the Marlton store. (Doc. No. 25-1 at 18-19.) Supervisor Marcantuno said that she did not believe that Mr. Redley was ready to become an STL because she felt he needed to ensure his responsibilities were being taken care of, and that he needed to work on not coming across as overconfident. (Doc. No. 28-5 ¶ 166.) Instead, Carol Kingsmore was selected for this position. (Doc. No. 25-1 at 18-19.) Mr. Redley believed that she had worked at Whole Foods for over ten years, at multiple stores, and characterized her as "a wonderful lady" who "put her time in." *Id.* Mr. Redley also claimed, however, that she had weaknesses as an employee, but he could not give specifics. *Id.* Mr. Pinkney testified that the Marlton store needed an STL with strong merchandising skills, and that while Mr. Redley admitted that this was one of his weaknesses, Mr. Pinkney testified that merchandising was one of Ms. Kingsmore's strengths. *Id.*

Mr. Redley also claims that he applied for the 2017 South Street position. (Doc. No. 25-1 at 19-20.) Mr. Anselmi, who "grew up in the grocery business," also applied for the position, and his supervisor testified that he was well-rounded in all attributes required of an STL. *Id.* Mr. Anselmi, not Mr. Redley, was selected for the South Street position.

In 2018 Mr. Redley applied for an STL opening at Plymouth Meeting, along with at least three other applicants: Kevin Paoletti, Megan Murtha, and Jaleel McFadden. (Doc. No. 25-1 at 20-21.) A panel in charge of selecting the Plymouth Meeting's new STL selected Jaleel McFadden. Kevin Paoletti won the second highest number of votes. *Id.* After Mr. Redley's interview, Mr. Pinkney told him that he had "not come across as genuine," that "he did not connect with the group or the store," and had not given the "panel member[s] confidence that [he] was the right person to be a store team leader." *Id.* at 20. However, Mr. Pinkney later testified that he could remember little of the panel interview, and did not know who on the panel said that Mr. Redley did not come across as genuine. (Doc. No. 28-5 ¶ 188.) Mr. Redley contends that he was more qualified than Mr. McFadden because he had been in charge of opening a store, had relocated to another store, and had worked at a flagship store as an ASTL. (Doc. No. 25-1 at 20.) Mr. McFadden, on the other hand, was a part of the team that opened the Philadelphia Center City store, which was so successful that the store won Rookie of the Year. *Id.*

Next, Mr. Redley applied for an STL position at Princeton. *Id.* ¶ 179. At this time, he had already filed a charge of discrimination. *Id.* The position was only posted for current STLs, which both parties agreed was a common practice if the store had many TMs, customers, or a large sales volume. *Id.* ¶ 180. Mr. Redley was told that he could reapply if the position was opened up to current ASTLs.

6

In 2018, Mr. Redley also applied for an STL position at the South Street location. *Id.* at 21. Ms. Quigg testified that Mr. Redley prepared action plans that Ms. Quigg and others reviewed, and that Mr. Redley practiced mock interviews with Ms. Quigg and others. *Id.* ¶ 198. Three other people applied for the job also: Megan Murtha, Sean Lee, and Joe Burton. (Doc. No. 26 at ¶ 191.) Out of the four applicants, only Mr. Burton had prior STL experience. *See id.* A 12-member panel chose Mr. Burton, in part because he had prior STL experience and had an excellent interview. (Doc. No. 25-1 at 21.) Moreover, Mr. Phaup, who was an executive leader and was on the panel, testified that none of the other 12 panelists had felt strongly that Mr. Redley should have received the position. *Id.* at 22.

After interviewing for the South Street location in 2018, Mr. Redley left on medical leave and has not returned to work. *Id.* ¶ 200. Mr. Redley stated that he has taken more time to focus on his real estate business "99 Solutions LLC," through which he owns 23 properties. *Id.* ¶¶ 72, 201.

## III.    Other Evidence of Alleged Racial Animus

Mr. Redley cited two situations in which he believed Whole Foods retaliated against employees for reporting race discrimination. First, Mr. Redley alleges that a TM named Lorenzo claimed that Mr. Quigg called him a "dirty, nappy headed boy." *Id.* ¶ 91. Mr. Redley heard Lorenzo's complaint, and spoke to others who witnessed the event, but he did not witness the event himself. *Id.* ¶ 91. Ms. Quigg denies having made the statement, but reported the incident to Regional Management. *Id.* ¶ 92.

Another event allegedly involved Cherrie Dashields, Mr. Redley's co-ASTL at Plymouth Meeting. Ms. Dashields is black, and complained to Mr. Pinkney that Mr. Stirzel showed "favoritism" and, of questionable evidentiary value for considering racial animus, needed to be more organized. *Id.* ¶ 97. Ms. Dashields and Mr. Stirzel were "fighting every day," and Mr.

7

Redley testified that Mr. Stirzel "was embarrassing her in front of team leaders." *Id.* ¶ 98. Mr. Redley told Ms. Dashields that she needed to stop spending "extra time with team members instead of doing other things," and encouraged her that it "would be a good idea for her to do something else." *Id.* ¶¶ 99, 102. Ms. Dashields did step down from her ASTL position and became a payroll and benefits specialist. *Id.* ¶ 103. Mr. Redley believed that Ms. Dashields switched roles, at least in part, because of "family reasons," but now argues that her employment change is also evidence of racial bias. *Id.* ¶ 105.

Mr. Redley also stated that Mr. Stirzel demoted two other black individuals: Kwame Danquah and Mike Mensah. *Id.* ¶ 107. Mr. Redley stated that the issue with Mr. Mensah "was some communication issues and some merchandising issues." *Id.* Mr. Stirzel allegedly told Mr. Redley that Mr. Danquah needed "more support from us," and felt that he was an "asset to this store" who needed to be invested in to be more effective. *Id.* ¶ 109.

Mr. Stirzel was sued for discrimination by Shiloh Pressley, who claimed he was discriminated against because of his disability and his race. Mr. Pressley was disciplined, and his employment was terminated for parking too close to the store entrance and for failing to provide purchase orders. *Id.* ¶ 109 n.1. Pressley was not an ASTL seeking an STL position. *Id.* Mr. Stirzel was also sued by Carl Johnson for race discrimination, though neither party offers any additional facts about that lawsuit. *Id.*

**DISCUSSION**

Mr. McFadden brings two claims under Title VII: disparate treatment and disparate impact.[4] The Court will discuss each in turn.

---

[4]     While Mr. McFadden also brings claims under 42 U.S.C. § 1981, the Pennsylvania Human Relations Act ("PHRA"), and the Pennsylvania Fair Practices Ordinance ("PFPO"), these claims are derivative of his two Title VII claims. Thus, to the extent that the Court grants Whole Foods's motion for

## I.     Disparate Treatment

Under the *McDonnell Douglas* burden-shifting framework, a claim advances in three stages. First, a plaintiff must plead a prima facie case of discrimination. *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999). If the plaintiff does so, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

The parties do not contest that Defendants have satisfied the second element: articulating a legitimate, non-discriminatory reason for rejecting Mr. Redley until 2018. Thus, the question is whether Mr. Redley can meet the first and third elements: his *prima facie* case, and evidence of pretext.

### A.  *Prima Facie* Case

A plaintiff must show four things to establish a *prima facie* case of disparate treatment: (1) that the plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for the job; (3) plaintiff was rejected; and (4) the adverse action occurred under circumstances that would give rise to an inference of discrimination. *See Young v. Pennsauken Twp. Sch. Dist.*, 47 F. App'x 160, 161 (3d Cir. 2002). Defendants do not contest that Mr. Redley was a member of a protected class, that he applied to positions,[5] or that he was rejected for the positions that he applied to, but

---

summary judgment as to Mr. McFadden's Title VII claims, the Court also grants summary judgment as to his parallel claims under § 1981, the PHRA, and the PFPO.

[5]     Mr. Redley argues at length that he meets the application requirement, and that three cases Whole Foods cites—*Bates, Dusch,* and *Constantine*—are distinguishable. But Mr. Redley must confuse the arguments made in Mr. McFadden's case with those made in his case. Whole Foods does not dispute that Mr. Redley meets the application requirement. (*See* Doc. No. 25-1 at 13 ("Solely for the purpose of this

9

do contest whether Mr. Redley (i) was qualified for the jobs he applied to and (ii) was rejected under circumstances giving rise to an inference of discrimination.

### i. Whether Mr. Redley Was Qualified

The standard for proving that one was qualified for the job is not especially hard to meet. A plaintiff need only show that he "would realistically have been in the running for the job absent the alleged discrimination," *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994), looking only at the objective qualifications for the job, *see Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 540-42 (3d Cir. 2006). In other words, at this stage courts inquire "only into the bare minimum requirement necessary to perform the job at issue." *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008).

Whole Foods concedes that Mr. Redley was objectively qualified for every job that he applied for, except the 2014 North Wales STL position and the 2018 Princeton STL position. While Mr. Redley argues that he was qualified for the 2014 North Wales STL position because the three-year experience requirement was neither objective nor uniformly applied, this debate is moot. As he concedes, Whole Foods's allegedly discriminatory acts that occurred before July 3, 2015 are time-barred, thus excluding the North Wales job from the Court's focus. (Doc. No. 39-2 at 10 n.2.) Mr. Redley also concedes that "he was not objectively qualified for [the 2018 Princeton] position because he was not serving as an STL at the time he applied." Therefore, summary judgment as to these two "failures to promote" is appropriate.

---

motion, Whole Foods will not contest whether [Mr. Redley] can establish he . . . applied for STL positions as Plaintiff applied directly through the job portal on a number of occasions.")). Indeed, Whole Foods does not cite *Constantine* in Mr. Redley's case, though they do so in Mr. McFadden's. While Whole Foods does cite *Bates* and *Dusch*, they do so for other purposes. Accordingly, the Court need not consider Mr. Redley's argument that applying for this position would have been futile.

For the remaining positions, Whole Foods argues that Mr. Redley was not similarly situated or more qualified than the individuals who were hired. Whole Foods appears to concede these questions are appropriately dealt with as a part of the pretext analysis, and not at the prima facie stage, where only objective qualifications are relevant. Thus, the Court considers Whole Foods's arguments regarding Mr. Redley's "subjective" qualifications below.

#### ii.  *Circumstances giving rise to an inference of discrimination*

A plaintiff shows circumstances giving rise to an inference of discrimination with any kind of relevant evidence, including "comparator evidence, evidence of similar racial discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010). In doing so, courts recognize a "need to eschew rigid *prima facie* formulations." *Johnson v. Del. Cty. Juvenile Det. Ctr.*, No. 11-1166, 2012 WL 895507, at *7 (E.D. Pa. Mar. 16, 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). To make out his prima facie case of discrimination, Mr. Redley relies on a variety of evidence, which can be roughly sorted into three categories: comparator evidence, evidence of discrimination against other employees, and evidence of discriminatory comments.

#### a.  *Comparator evidence*

A plaintiff may make out a prima facie case through "comparator evidence": "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

As a preliminary matter, Whole Foods argues that there are no appropriate comparators, because none of the individuals Mr. Redley references worked for the same STL as Mr. Redley did. It is true that in some contexts, courts have held that alleged comparators were not relevant

11

because they did not work for the same supervisor as the plaintiff. *See, e.g.*, *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (one factor to determining whether employees are similarly situated is whether they have the same supervisors and decision-makers). However, the Third Circuit Court of Appeals has also stated that evidence "concerning purported comparators with different supervisors is neither per se admissible nor per se inadmissible." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). Rather, such "[q]uestions of relevance and prejudice are for the District Court to determine in the first instance." *Id.* (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008)).

Here, comparators who worked for other STLs are at least marginally relevant. The evidence shows that employees were often (indeed, usually) hired as an STL into a store other than the store where they previously worked as an ASTL or STL. (*See McFadden*, Doc. No. 32-9 at 56-57 (other Whole Foods regions used the same hiring methods as MA North); *id.* at 57-58 (Ms. Lesniak was hired into Marlboro, NJ store from a store in a different region)). Whole Foods treated employees as a part of the same "pool," as evidenced by the fact that they would "swap" ASTLs to different stores to prevent them from becoming stagnant in one position. (*McFadden*, Doc. No. 35-19 ¶ 22.) (*See also* Doc. No. 25-1 at 16 ("[A] candidate for [an STL] position could come from any store in the United States to fill the position.")) Because these employees were all a part of the same "pool" and were hired according to the same objective qualifications, the fact that they had a different supervisor does not bar them from being comparators.

Thus, to create an inference of discrimination, Mr. Redley must provide "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)). Mr. Redley does not

point to any specific comparators. Rather, he responds to Whole Foods's arguments against his "proffered comparators." While it would have been preferable for Mr. Redley to brief why he believed each comparator was relevant, the Court will construe this statement as adopting each of the comparators preemptively discussed by Whole Foods as his own.

The first potential comparator Whole Foods discusses is Omar Tejeda. In 2017, Mr. Redley expressed interest in the STL positions at Vienna and Marlton. But both times, Mr. Pinkney refused to support Mr. Redley, supporting Mr. Tejeda instead.[6] (*See* Doc. No. 42-1 at ¶¶ 69-82.) Mr. Pinkney's stated reason was that he did not want two ASTL's leaving the region at the same time. *Id.* ¶ 70.[7]

The second potential comparator is Carol Kingsmore. She was selected for the 2017 Marlton position over Mr. Tejeda, when Mr. Redley was not permitted to apply. (Doc. No. 39-33 ¶¶ 170-73.) It is true that Ms. Kingsmore appeared to be a very well-regarded employee who had over ten years of experience. But as she and Mr. Redley both satisfied the objective requirements for the job, the different treatment she received can be considered in conjunction with other comparators.

The third potential comparator is Joe Anselmi. Both he and Mr. Redley were objectively qualified for the job, and Laurent Dallot—Mr. Anselmi's supervisor—supported him for the 2017

---

[6]     It is true that Mr. Pinkney is black, and as Whole Foods argues, the inference of discrimination is weakened when the decision-maker belongs to the plaintiff's protected class. *See, e.g.*, *Burch v. WDAS AM/FM*, No. CIV.A. 00-4852, 2002 WL 1471703, at *7 (E.D. Pa. June 28, 2002). But this is not the only piece of comparator evidence that Mr. Redley offers.

[7]     This rationale is somewhat confusing, because there was only one STL for each store. As a result, even if Mr. Pinkney supported both candidates, at most only one could have left the store. But because Mr. Redley does not argue this point, the Court will not discuss it further.

13

South Street position. (Doc. No. 42-1 ¶ 86.) Mr. Pinkney refused to support Mr. Redley for the job. *See id.* at ¶¶ 69-82.

The fourth potential comparator is Joe Burton. In 2018, Mr. Redley and Mr. Burton both applied for the STL South Street position after Mr. Anselmi left. Even though Mr. Phaup did not want Mr. Burton to apply for the position, Mr. Burton was selected ahead of Mr. Redley. (Doc. No. 39-33 ¶ 191.b.) It is true that Mr. Burton had STL experience, but this was not an objective requirement for the job—only ASTL experience was required. *Id.*

In sum, Mr. Redley can point to multiple individuals who had the same objective qualifications for STL positions, but received better treatment—either by being permitted to apply, or by ultimately being selected for the position. While Whole Foods argues that these individuals had better subjective qualifications, weighing those against Mr. Redley's qualifications is a question of fact inappropriate for summary judgment, and particularly so at the prima facie stage of Mr. Redley's case. *See, e.g.*, *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) ("Whether comparators are similarly situated is generally a question of fact for the jury.").

### b. *Discrimination against other Whole Foods employees*

Mr. Redley points to two discrimination lawsuits brought by other employees against one of Mr. Redley's supervisors, Mr. Stirzel. *See Pressley v. Whole Foods Mkt. Grp., Inc.*, No. 18-11420, Doc. No. 1-1 at 3-5 (D.N.J. July 6, 2018) (alleging that Mr. Stirzel repeatedly ridiculed Mr. Pressley on account of his race and announced that he had hired a white applicant over an African American applicant because the latter "had an accent"). But the only position that Mr. Redley applied to while Mr. Stirzel was his supervisor was the 2014 North Wales position. Mr. Redley does not contest that this claim is time barred. Nor does he argue that Mr. Stirzel could have affected his promotion in other ways, including for instance by serving on one of the interview

panels responsible for selecting an STL candidate. Therefore, even if Mr. Redley could show that Mr. Stirzel had discriminated against other black employees, this evidence is not probative of an alleged failure to promote Mr. Redley on behalf of his race.[8]

### c. *Discriminatory comments by supervisors*

Third, Mr. Redley attempts to make his prima facie case through reference to "statements or actions by [the plaintiff's] supervisors suggesting racial animus." *Wright v. Northampton Cmty. Coll.*, No. 18-2976, 2020 WL 3050707, at *8 (E.D. Pa. June 8, 2020) (alteration in original) (quoting *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010)). Such comments, even if they fall short of discrimination, may be relevant because a "reasonable fact finder could infer that a superior that utters such racial comments could more generally view an employee through a lens tainted with racial animus." *Id.*

Mr. Redley points to the fact that Carter Quigg allegedly called another Black employee a "dirty, nappy-headed black boy." (Doc. No. 25-1 at 11.) While there is no eyewitness testimony in this case, Mr. Redley "fielded the team member's . . . complaint and spoke to others who witnessed the event." (Doc. No. 39-33.) He also alleges that Ms. Quigg "micromanaged" him and demeaned his ideas during public meetings, leading other employees to tell Mr. Redley that Ms. Quigg treats him differently than others.

Unlike his accusations against Mr. Stirzel, his allegations against Ms. Quigg are relevant because she was his supervisor during times that he applied to STL positions, and was on at least

---

[8]     Mr. Redley also argues that comparator evidence is not required, and that his prima facie case is also made by pointing to Mr. McFadden's case, which alleges similar discrimination. (*See* Doc. No. 39-2 at 27.) Mr. McFadden makes the same argument in reverse, citing Mr. Redley's case. (*See McFadden*, Doc. No. 35 at 19-20.) Because the Court finds that Mr. Redley has met his prima facie burden through comparator evidence and evidence of alleged discrimination against other employees, the Court need not decide whether two plaintiffs simultaneously alleging similar mistreatment can "bootstrap" each other's prima facie cases.

one interview panel in charge of considering Mr. Redley's application. She gave him a poor review during this interview. (*See* Doc. No. 42-1 at 39.) Whole Foods dismisses Ms. Quigg's statements to the other employee as "stray remarks at best." (Doc. No. 25-1.) While it is true that "such remarks, standing alone, are not sufficient to support an inference of discrimination, '[they] can . . . constitute evidence of the atmosphere in which the employment decision was carried out.'" *Flores v. Pennsylvania*, No. 18-0137, 2018 WL 5884616, at *7 (E.D. Pa. Nov. 9, 2018). Therefore, this evidence, at least when combined with Mr. Redley's comparator evidence, creates a prima facie case of discrimination.

Finally, even supposing that the foregoing categories of evidence are insufficient, a plaintiff can make out a prima facie case with the same evidence used to demonstrate pretext. *See, e.g., Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) ("Although evidence of pretext is normally considered at the last step of the *McDonnell Douglas* analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case."). Because, as noted in the following section, Mr. Redley has produced enough evidence that a jury could find that Whole Foods's proffered reasons are pretextual, he has made out a prima facie case of discrimination.

### B. Pretext

After the plaintiff has made out a prima facie case of disparate treatment, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 2014). Mr. Redley does not contest that Whole Foods has articulated nondiscriminatory reasons for rejecting his STL applications. Those reasons vary based on the position in question, and include that Mr. Redley was "overconfident," that he was less qualified than other employees, that it would be difficult for the store to lose two ASTLs at once, or that he simply required more experience before he would be ready to be an STL. (*See* Doc. No. 25-1 at 25-27.)

16

As discussed above, before litigation began, Whole Foods's explanations focused on Mr. Redley's experience, stating that he needed another type of experience first, that he did not interview well, or even declined to give any feedback at all. After litigation began, Whole Foods represented in a contention interrogatory that he was not promoted to an STL position because he never applied until 2018. (Doc. No. 39-23 at 7.) Now Whole Foods concedes that he did apply, but says that he was not hired because he was not qualified. (Doc. No. 25-1 at 13-14.) A jury could infer from Whole Foods's shifting explanations that the proffered reasons for not promoting Mr. Redley are not Whole Foods's true reasons. *See, e.g.*, *Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (plaintiff had demonstrated pretext where the defendant "offered inconsistent explanations"); *May v. PNC Bank*, 434 F. Supp. 3d 284, 298-99 (E.D. Pa. 2020) (contradiction between interrogatory response and summary judgment motion "creates a triable issue with respect to pretext, and a jury could conclude that the contradictory explanations [] undermine[] the [defendant's] proffered non-discriminatory reason"). Because Mr. Redley has demonstrated that Whole Foods's explanations have shifted over time, summary judgment on Mr. Redley's disparate treatment claim is improper, except as detailed above with his prima facie case. *See supra* Section I.A.i.

## II.   Disparate Impact

A disparate impact claim does not require any evidence of the Defendant's motive. Rather, Title VII outlaws "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). To prevail, a plaintiff must point to a "specific employment practice [that is] facially neutral," that has a "significantly discriminatory impact." *Crawford v. Verizon Pa., Inc.*, 103 F. Supp. 3d 597, 608 (E.D. Pa. 2015). A plaintiff must offer statistical evidence "'of a kind and degree sufficient to

17

show that the policy or practice in question' caused the disparate impact." *Id.* at 608 (quoting *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 299 (3d Cir. 2014)).

As noted above with regards to Mr. Redley's prima facie case for disparate treatment, there is a dispute of fact as to whether Whole Foods had a policy that employees would only be considered for a promotion if they were "tapped." Mr. Redley argues that while this policy of requiring supervisor support is facially neutral, it gives STLs "license to allow their conscious and subconscious biases to dictate the process." (Doc. No. 35 at 40.) Accordingly, Mr. Redley has met his burden of pointing to a specific employment practice that is facially neutral.

However, Mr. Redley has not come forward with sufficient statistical evidence to support his claim that this "tap" policy created a disparate impact. In order to make the statistical link between the practice and the racially unequal result, courts require "statistical analysis or expert [testimony]." *Crawford*, 103 F. Supp. 3d at 609. For example, the court in *Crawford* dismissed a plaintiff's Title VII racial disparate impact claim because he could only point to "data concerning six individuals." *Id.*

The Court puts to one side the parties' dispute over whether the Philadelphia or MA North region is the appropriate scope for statistical analysis. Even assuming that the proper scope of analysis is the MAN Metro region, as Mr. Redley urges, Mr. Redley's statistical evidence falls well short of the proof required. Indeed, his statistical evidence is far sparser than that in *Crawford*. He limits his entire statistical analysis to one sentence: "[Mr. McFadden and Mr. Redley] were the only two (2) Black ASTLs in the entire MAN Metro region." But Mr. Redley does not even include in his briefing how many ASTLs there were in total in the MAN Metro region during this time.

18

Ironically, it is Whole Foods that fills in the statistical picture somewhat, pointing out that Mr. Redley alleges in his complaint that there were 20 ASTLs at the time that Mr. Redley filed his EEOC complaint, which would mean that 10% of ASTLs were black. Today, there are three black ASTL's which would seem to increase the percentage to 15%. (Doc. No. 39 at 14.)

Even if the Court was inclined to allow Mr. Redley to benefit from the briefing of Whole Foods, this statistical evidence is still insufficient for the issue at hand. Mr. Redley offers no statistical or expert evidence to demonstrate whether these numbers are evidence of discrimination. If the percentage of black Whole Foods employees in the MAN Metro region tracks the national percentage, then it would be expected that 10-15% of ASTLs are black. If the percentage of black Whole Foods TMs in the MAN Metro region is much higher than the national average, the fact that only 10-15% of supervisors were black may be evidence of discrimination.

But even if Mr. Redley could demonstrate that the percentage of black ASTL's within the MAN Metro region is far below the percentage of black Whole Foods employees as a whole, that would still not be enough as a matter of necessary evidence. He would still have to demonstrate that the statistical disparity was *caused by* the discriminatory "tap" policy. "[P]laintiff's burden under the disparate impact analysis ¹goes beyond the need to show statistical disparities in the employer's work force.'" *Spence v. City of Phila.*, No. CIV.A.03-CV-3051, 2004 WL 1576631, at *7 (E.D. Pa. July 1, 2004), *aff'd on other grounds,* 147 F. App'x 289 (3d Cir. 2005) (quoting *Watson v. Fort Worth Bank & Tr.,* 487 U.S. 977, 994 (1988)). Rather, "[p]laintiff must show 'a causal connection between the challenged policy . . . and a racially unequal result.'" *Id.* (quoting *EEOC v. Greyhound Lines,* 635 F.2d 188, 193 (3d Cir. 1980)). Because Mr. McFadden has shown neither a statistical disparity nor a causal connection, the Court will grant Whole Foods's motion for summary judgment as to his disparate impact claim.

### III.     Hostile Work Environment

The parties filed four briefs in total: a brief in support of summary judgment, a brief in opposition to summary judgment, a reply in support of summary judgment, and a sur-reply in opposition to summary judgment. Throughout these briefs, it slowly became apparent that the parties had different conceptions about what causes of action Mr. Redley is alleging, and which of these causes of action Whole Foods had properly moved for summary judgment on. The Court will consider these two preliminary issues before reaching the merits of Mr. Redley's hostile work environment claim.[9]

#### A.   Whether Mr. Redley Pled Hostile Work Environment

Whole Foods argues that it was unclear whether Mr. Redley alleged a claim for hostile work environment at all, because it was not listed as a separate claim. It argues that he also failed to allege facts he now relies on, including "lengthy shifts, increased store closings, micromanagement, etc., so it is questionable whether such facts are even properly before this Court." (Doc. No. 42 at 20 n.22.) Mr. Redley responds that "Defendants were well-aware of Plaintiff's retaliation claims: they were . . . pleaded with precision in Plaintiff's First Amended Complaint." (Doc. No. 43 at 5.) While Mr. Redley may overstate his case by saying that this was "pleaded with precision," Whole Foods is incorrect that the complaint does not include these factual allegations: they are all pled in paragraph 87 of the First Amended Complaint. (Doc. No. 18-1 ¶ 87.)

---

[9]     Mr. Redley also raises a third preliminary issue for the first time in his sur-reply. He states that Whole Foods "claim[s] (for the first time) that Plaintiff failed to administratively exhaust his retaliatory hostile work environment claim." (Doc. No. 43 at 10.) But the Court has searched Whole Foods's briefing for any discussion of administrative exhaustion to no avail. It is unclear whether Mr. Redley simply misread Whole Foods's briefs, or inserted this argument by mistake. In any case, because it was not properly presented, the Court will not discuss the issue further.

However, Whole Foods does have a fair claim of confusion due to the structure of Mr. Redley's complaint. Mr. Redley included discussion of hostile work environment only in the factual allegations section of his complaint. He then listed the individual counts he is alleging: (1) "Title VII Disparate Treatment"; (2) "Title VII Disparate Impact"; (3) "Section 1981"; (4) "PHRA"; and (5) "PFPO." Neither race-based hostile work environment nor retaliatory hostile work environment were listed. Mr. Redley offers no explanation for his choice to omit hostile work environment from his enumerated cases of action.[10]

A reasonable defendant could conclude that when a plaintiff expressly enumerates some causes of action, the plaintiff is omitting all other causes of action. While Rule 8 of the Federal Rules of Civil Procedure does not explicitly require separate legal theories to be listed as different counts, this is an almost universal practice. Courts often grant motions to for a more definite statement requiring plaintiffs to file an amended complaint with separate counts. *See, e.g.*, *N'Jai v. Floyd*, No. CIV.A. 07-1506, 2008 WL 618649, at *1 (W.D. Pa. Mar. 3, 2008), *aff'd*, 386 F. App'x 141 (3d Cir. 2010). But courts are less likely to strike a claim merely because it was not listed. *Compare Burford v. McDonald's Corp.*, 321 F. Supp. 2d 358, 365 (D. Conn. 2004) (refusing to strike claim for retaliation where it was not separately plead), *with Robbins v. Banner Indus., Inc.*, 285 F. Supp. 758, 760 (S.D.N.Y. 1966) (granting motion to dismiss where Plaintiff did not state "in separate counts the various legal theories upon which recovery is claimed."). Ultimately, the choice of how to enforce Rule 8 is committed to the district court's discretion. *See Sixth Angel Shepherd Rescue, Inc. v. West*, 477 F. App'x 903, 910 n.12 (3d Cir. 2012) ("This court reviews a district court's decision to dismiss claims under Rule 8 for abuse of discretion.").

---

[10] Indeed, Mr. Redley later argues that he actually has two claims for hostile work environment—one for race-based hostile work environment, and another for retaliatory hostile work environment. This point is discussed below.

How to exercise discretion in this case is a challenging question. On the one hand, this case is so well as to question allowing Mr. Redley to amend his complaint for a second time. On the other hand, Rule 8 endorses a program of lenient "notice pleading." Whole Foods was evidently on notice of Mr. Redley's alleged hostile work environment because they included it in their motion for summary judgment (though they did note that it was "unclear" whether Redley was pursuing a claim for hostile work environment).

In light of the fact that the complaint at least mentions "hostile work environment," even if only in the fact section, the Court will deem this claim as a part of Mr. Redley's complaint. This result is confirmed by the Supreme Court's instruction that "[n]o technical forms of pleading . . . are required." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). "While Plaintiff's complaint would undoubtedly have been clearer" had this been given its own count, the complaint nevertheless states that Mr. Redley believed he had been subjected to a hostile work environment. *Burford*, 321 F. Supp. at 365.

### B. Whether Whole Foods moved for summary judgment on Mr. Redley's *retaliatory* hostile work environment claim

Mr. Redley next argues that while Whole Foods mentioned his race-based hostile work environment claim, they failed to move for summary judgment on his *retaliatory* hostile work environment claim. (*See* Doc. No. 39-2 at 42-46.) Whole Foods responds that it was not clear what exactly Mr. Redley was alleging, and that in any case their argument against Mr. Redley's race-based retaliation claim applies in equal measure to a retaliatory hostile work environment claim: namely, that regardless of why Mr. Redley was allegedly subjected to a hostile work environment, the conduct was not sufficiently "severe or pervasive" to be actionable. (*See* Doc. No. 42 at 20-21.)

Neither party presents any precedent for a situation like this: namely, the plaintiff only included reference to a cause of action in a background fact section, and the defendant responded to one species of that cause of action in a motion for summary judgment, but its argument was equally applicable to both. The authorities each party does cite are inapposite. The cases Whole Foods cites regarding "notice" all involve *sua sponte* grants of summary judgment. The cases Mr. Redley cites involve summary judgment where a defendant completely failed to move for summary judgment on a particular cause of action.

The Court is ultimately unpersuaded by Mr. Redley's argument. Mr. Redley cannot point to a case where a court split hairs between race-based and retaliatory hostile work environment to deny summary judgment, where it was less than clear that the plaintiff was alleging either. The Court has likewise been unable to find such a case. This absence of authority speaks for itself.

Moreover, Mr. Redley simultaneously urges the Court to overlook that he did not separately enumerate *any* claim for hostile work environment, and to fault Whole Foods for not separately discussing race-based and retaliatory hostile work environment. The Court will not strictly hold Whole Foods to the language it used to characterize a claim it could not have known for certain that Mr. Redley was pursuing. Federal courts prefer "that cases be disposed of on the merits whenever practicable." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535 (D.N.J. 2008) (quoting *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984)). Accordingly, the Court will consider on the merits Whole Foods's argument that Mr. Redley has not met the "severe or pervasive" element for either race-based or retaliatory hostile work environment.

## C. Whether Mr. Redley Has Met the Severe or Pervasive Standard

In considering whether a plaintiff has met the severe or pervasive standard, courts consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

23

employee's work performance." *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 543-44 (E.D. Pa. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[O]ffhanded comments[] and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Id.* at 544 (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)). "When ascertaining whether the severity and pervasiveness of alleged discrimination are sufficient to constitute a hostile work environment, the court looks at the totality of the circumstances rather than concentrating on individual incidents." *Id.* (quoting *Peace–Wickham v. Walls*, 409 Fed. Appx. 512, 519 (3d Cir.2010)).

Mr. Redley's hostile work environment claim is limited to indignities he says he suffered at the hands of Ms. Quigg. He argues that for a 14-month period of time, Ms. Quigg assigned him to longer shifts at more undesirable times than those assigned to his white peers, that she micromanaged him and demeaned his ideas in the presence of others, that other employees told him that they noticed that Ms. Quigg treated him differently, that she selected Mr. Redley to effectuate the termination of a black employee's job solely because Mr. Redley was also black, and that she called a black employee "dirty" and "nappy headed."

One can legitimately doubt whether these facts, viewed in isolation, are "severe." Other courts have concluded that being assigned to longer and less desirable shifts does not meet the standard for a hostile work environment claim. *See Denning v. Cty. of Washoe*, 799 F. App'x 547, 547-48 (9th Cir. 2020) (being assigned to "longer shifts and less desirable tasks" fell "short of the 'extreme' behavior required for a hostile work environment claim."). Indeed, Mr. Redley does not even contest that terminating employees' jobs was explicitly one of his job duties.

However, "it is insufficient to assess incidents individually as if each were hermetically sealed from the others." *Pikowski v. GameStop, Inc.*, No. 11–2732 (FLW), 2013 WL 6498072, at

24

*10 (D.N.J. Dec. 11, 2013). Rather, "courts must evaluate the record 'as a whole,' concentrating 'not on individual incidents, but on the overall scenario." *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 443 (E.D. Pa. 2014) (quoting *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001)).

It is conceivable that a reasonable jury could find that the conduct alleged, when considered with other circumstances or events causing Mr. Redley discomfort, was at least pervasive. Mr. Redley stated in his testimony that he was "consistently" given worse hours than his white counterparts. While the fact of getting worse hours is facially neutral, it must be considered in light of the allegation that Ms. Quigg used racially discriminatory comments. Such comments, even if directed towards third parties, "may be considered in determining whether facially neutral conduct on the part of [defendants] was actually based on [plaintiff's] race." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005). In light of these allegations, and the fact that the "severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact," the Court denies Whole Foods's motion for summary judgment on Mr. Redley's hostile work environment claims. *King v. City of Phila.,* 2019 U.S. Dist. LEXIS 58096, at *14 (E.D. Pa. Apr. 3, 2019) (quoting *Rorrer v. Cleveland Steel Container,* 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010)).

## CONCLUSION

For the foregoing reasons, Whole Foods's motion for summary judgment is granted in part and denied in part. An appropriate order follows.

25

BY THE COURT:

_____

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**